# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Joan H. Lefkow | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 CR 1065 | **DATE** | 9/15/2003 |
| **CASE TITLE** | USA vs. Bouzanis, et al. | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]  Enter Memorandum Opinion and Order. Motion of the Government to admit "other act" evidence pursuant to Rule 404(b) [121-1] is denied. Enter Memorandum Opinion and Order. Motion of defendant JACPG to sever the charges against JACPG from the charges against defendant Marin [122-1] is denied. Government's motion *in limine* to introduce the proposed redacted statement by defendant Marin [120-1] is denied without prejudice. Government's *Santiago* proffer [119-1] is granted.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | 4 | **Document Number** |
| | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | SEP 16 2003 | |
| | Notified counsel by telephone. | | date docketed | |
| | Docketing to mail notices. | | docketing deputy initials | |
| | Mail AO 450 form. | | 9/15/2003 | 129 |
| | Copy to judge/magistrate judge. | | date mailed notice | |
| MD | courtroom deputy's initials | | MD mailing deputy initials | |
| | | Date/time received in central Clerk's Office | | |

U.S. DISTRICT COURT

00 SEP 16 PM 8:16

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| vs. | ) | No. 00 CR 1065 |
| | ) | Judge Joan H. Lefkow |
| PETER BOUZANIS, GEORGE PALIVOS, | ) | |
| JACPG, INC., PETER PALIVOS and | ) | |
| LOUIS MARIN, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

Defendant, Peter Palivos, has been indicted by the United States of America ("United States" or "government") on charges of conspiracy and obstruction of justice for allegedly creating and fabricating false documents in an attempt to interfere with a federal grand jury investigation into a 1996 loan deal guaranteed by the United States Small Business Administration ("SBA"). Also charged in the Fifth Superseding Indictment are defendants Peter Bouzanis ("Bouzanis"), a fugitive, Peter Palivos' brother George Palivos, also a fugitive, JACPG, Inc. ("JACPG"), a dissolved Illinois corporation, and Louis Marin ("Marin"). Trial is set to begin for Peter Palivos, JACPG and Marin on September 16, 2003. The United States has now moved under Rule 404(b), Fed. R. Evid., to admit "other act" evidence against Peter Palivos. The motion is denied, as stated below.

DOCKETED
SEP 1 8 2003

*129*

## BACKGROUND

### A.    Peter Palivos' Alleged Conspiracy and Obstruction of Justice

In April 1996, JACPG[1] sold to Bouzanis the Waterfalls Restaurant in Antioch, Illinois, for $1.79 million. Bouzanis borrowed from the Money Store approximately $1.25 million to fund the restaurant's purchase. This small business loan was partially guaranteed by the SBA. Shortly after the sale, in June 1996, the SBA's Office of Inspector General began investigating allegations that Bouzanis had fraudulently obtained the small business loan used to purchase the restaurant. The government's version of the circumstances surrounding the loan and subsequent events is as follows.

In 1995, when JACPG first decided to sell the restaurant to Bouzanis, Bouzanis applied to the Money Store Investment Corporation, an arm of the Money Store that dealt with SBA guaranteed loans, for a commercial loan to purchase the restaurant. Bouzanis represented to the Money Store that his down payment would be financed with an inheritance he received from his father in the amount of $400,000. The United States alleges that no inheritance in that amount ever existed. At that point or shortly thereafter, the Money Store apparently tentatively approved Bouzanis for a loan to purchase Waterfalls from JACPG.

In early March 1996, The Money Store notified the parties that the loan-to-value ratio for the loan needed to be reduced from 80% to 70%. Thereafter, Nicholas Black ("Black"), the real estate attorney for JACPG,[2] informed the Money Store that the parties would decrease the loan-

---

[1]Peter Palivos' brother George was one of three shareholders of JACPG. The United States also maintains that Peter was a silent partner in the restaurant and owned a 1/6 share.

[2]Black was charged in the previous indictments in this case. He has pled guilty and will testify as a government witness at trial.

2

to-value ratio by increasing the purchase price of the restaurant to $1.785 million and have JACPG finance the difference through a $215,000 second mortgage and note to Bouzanis. Thereafter, Bouzanis obtained the $1.25 million dollar loan from the Money Store.

On April 24, 1996, the day of the closing, the United States alleges that Bouzanis, George Palivos, and Individual C went to Broadway Bank in Chicago, where Bouzanis obtained a five-day interest-free loan secured by Individual C's accounts. After payment of the loan fee, Bouzanis cleared $354,000 from the loan, which he used to finance his downpayment at the closing later that day. The United States alleges that Black had earlier asked George Palivos about the five-day loan that Bouzanis would obtain. George Palivos told Black that the loan would be obtained from Broadway Bank and that Bouzanis would use the proceeds of the closing to pay off the loan. When Black inquired about how any payment to Bouzanis would be explained, George Palivos allegedly stated that the parties would falsely claim a purchase price dispute, and that the money paid to Bouzanis would be in settlement of that dispute.

After the closing, Black wrote a check drawn on JACPG's bank account to Bouzanis in the amount of $392,500. The United States alleges that Bouzanis used this check to pay back the five-day loan at Broadway Bank. The United States also alleges that at the urging of George Palivos, Black postdated the check to April 27, 1996, to make sure that Bouzanis would not deposit the check until the money was available from the closing in JACPG's bank account. Black wrote on the check "Settlement in Full of All Claims and Disputes Re: Waterfalls Restaurant."

After the closing, apparently on April 26, one of Black's associates prepared a letter by George Palivos on Black's letterhead that purported to "settle" the fictitious purchase price

dispute. The letter explained that the "settlement" of the alleged dispute would be a payment of $392,500 to Bouzanis, and a forgiveness of the $215,000 second mortgage. In early 1997, the Waterfalls restaurant went into receivership; Bouzanis declared bankruptcy shortly thereafter.

On October 20, 2000, Black was served with a federal grand jury subpoena to produce documents relating to the Waterfalls Restaurant sales transaction. Black told the Palivos brothers that the Waterfalls investigation had focused on the documents surrounding the fictitious purchase price dispute, including the April 26 letter. George Palivos asked that Black send him a copy of whatever Black produced in response to the subpoena. Later, while at George and Peter Palivos' law firm on a separate matter, Black was asked by George Palivos if the file had been found yet. When Black replied that he had not yet found the file, Peter Palivos allegedly told Black that it would be "nice if there were notes in the file" explaining how at around the time of the closing George Palivos wanted a $25,000 check as the payoff for inventory, but wanted the payee left blank because he might give the check to Peter Palivos because George owed money to Peter. Peter Palivos further told Black that it would also be "nice" if there were notes in Black's file that documented the alleged purchase price disputes surrounding the condition of the restaurant.

On November 3, 2000, Black located the file for the Waterfalls Restaurant deal at his office. The United States maintains that the file did not contain any of the notes described above. Thereafter, Black was again at George and Peter Palivos' law firm and again spoke to Peter Palivos about the notes. Peter Palivos allegedly instructed Black to find six-year old paper and a six year old pen to create the notes, which Black understood to mean old paper and an old pen. Later, Black once again met with Peter Palivos and told him that he had found a legal pad and a

4

pen which he thought were old enough. Peter Palivos allegedly told Black to write the notes. Peter Palivos also allegedly instructed Black to rub the ink on the paper against something so that no one would be able to tell when it was written.

On approximately November 14 or 15, 2000, Black wrote out two handwritten notes with the information related to him by George and Peter Palivos regarding the purchase price dispute and the $25,000 check to Peter Palivos. Black allegedly knew that the entire purchase price dispute was fictitious and was just a way to explain why it was that the sellers gave Bouzanis money after closing so that Bouzanis could pay off the five-day loan at Broadway Bank, and to help Peter Palivos explain why he received $25,000 from Bouzanis after the closing.

On November 15, 2000, Black delivered the file containing the fabricated notes in response to the grand jury subpoena served on October 20, 2000. Later that evening Black went to dinner with Peter Palivos and gave Peter a copy of the documents that he had produced in response to the subpoena. When Peter Palivos saw the two handwritten notes that Black had fabricated, he said "thank you" and told Black that he appreciated what Black had done.

Subsequently, the grand jury ordered Black and others to submit handwriting exemplars, and the notes were submitted for forensic analysis. The analysis revealed that the notes Black produced in response to the grand jury subpoena had been fabricated after 1997, a year after they were dated and purportedly written. Peter Palivos was later indicted on the charges here of obstruction of justice and conspiracy to obstruct justice. He is not charged with having any involvement in the separate conspiracy set forth in the indictment concerning the allegedly fraudulent sale of the Waterfalls Restaurant.

**B.**    **"Other Act" Number One: The 1991 Federal Lawsuit**

In 1998, Peter Palivos (hereinafter "Palivos") and his law firm began to represent an individual in a personal injury and products liability claim against an American Corporation and two Czechoslovakian companies (the "Czech companies"). The statute of limitations for the plaintiff's claims ran on January 20, 1990. On January 4, 1990, Palivos filed a law suit in the Circuit Court of Cook County, and on January 5, 1990 sent a service of summons to the Cook County Sheriff for service on all three defendants. The service of summons for the Czech companies, however, needed to be effectuated by means of the Hague Convention and served on the companies in Czechoslovakia. Palivos did not properly do this.

In late May 1990, Palivos and his staff realized that service had not been properly effectuated on the Czech companies, and contacted the Czech Embassy in Washington D.C. by telephone. Efforts were then made to mail the complaint and summons to the Embassy and to Czechoslovakia on approximately May 21, 1990, well after the statute of limitations had run. Palivos, however, still failed to comply with Hague Convention requirements and service was not made on the Czech companies until at least October 1990. Thereafter, the case was removed on diversity grounds to this court on April 21, 1991 and was before the Honorable George M. Marovich. A day after removal, the Czech companies filed a motion to dismiss the complaint on grounds that the statute of limitations had run prior to service of process taking place.

On May 22, 1991, Palivos filed a response to the Czech companies' motion to dismiss. The response appended approximately 20 exhibits that Palivos claimed demonstrated that he and other members of his law firm had made reasonable efforts to attempt service on the Czech companies in a timely fashion. Among the exhibits filed were three letters which, over Palivos'

6

signature line dated January 5, 1990, February 28, 1990, and May 21, 1990, were addressed to "The Czechoslovakian Federal Republic Consulate Division" in Washington D.C. The first two letters were directed to the attention of the "Commerce Officer" while the third one was specifically directed to "Mr. Guluska" (sic) and stated that the letter was "to supplement our conversation of today." Based on these letters, Palivos argued in his response to the motion to dismiss that proper service had been made. The United States contends that all these letters were fabricated in April 1991 after the Czech companies' motion to dismiss had been filed, a point to which Palivos admitted at a subsequent ARDC hearing, but he denied any responsibility for preparing the falsified information. The evidence of falsification included that (1) persons appeared on the Palivos' Firm's letterhead who had not even worked as lawyers for the Palivos Firm at the time the letters were purportedly written; (2) the letters were all addressed to "The Czechoslovakian Federal Republic Consulate Division" in Washington, even though at the time the first two letters were dated the country was still officially called "The Czechoslovak Socialist Republic;" and (3) the third letter of May 21, 1990 was directed to "Mr. Guluska" (whose real name is spelled Galuska), who was not even in the United States or working at the Czech Embassy until late June 1990 and could not have had the conversation Palivos claimed.[3]

On September 11, 1991, Palivos appeared before Judge Marovich for a hearing on the motion to dismiss. Palivos told Judge Marovich that all the documents were genuine and that he had "never fabricated anything in this career." Palivos attempted to explain away any

---

[3]Later Palivos attached more documents to a supplemental response brief he filed. Attached as exhibits were two handwritten memos dated May 17, 1990, which he claimed demonstrated that he (1) personally called the Czech Embassy and spoke to a person called "Guluska" about the proper means of service and (2) instructed by handwritten memo a firm paralegal to again file the complaint and service of process on the Czech Embassy.

inconsistencies and appearances of falsification. According to the United States, at this hearing Palivos explicitly told Judge Marovich that he was the author of the May 21 letter and that it was legitimate. Nevertheless, Judge Marovich granted the Czech companies' motion to dismiss the complaint. He did not resolve the matter of the fabricated letters or impose sanctions, but did direct the attorneys for the Czech companies to file a report concerning Palivos with the ARDC.

The ARDC later filed a complaint and a hearing was conducted over the course of 1995-96. Palivos testified under oath that he had not written any of the three fabricated letters, had been furious when he discovered before Judge Marovich that they were fabricated, immediately conducted an "investigation" in his law firm, and eventually determined that the letters had been wholly made up by his personal secretary on her own. The Hearing Board Panel found that the ARDC had not proven by clear and convincing evidence that Palivos engaged in any conduct involving fraud, deceit or misrepresentation. The Hearing Board Panel did state that Palivos "should have known" that the representations he made were false and recommended a censure. These findings and recommendation were reviewed and affirmed by the Illinois Supreme Court. The United States advances its position that Palivos personally manufactured the 1990 documents in 1991, and lied repeatedly about it before Judge Marovich and under oath before the ARDC.

C.      **"Other Act" Number Two: The Offer of $10,000 to Leave Town**

The United States further alleges that in February and March 2000 Palivos attempted to get a potential witness in his pending divorce proceeding to leave Chicago so that the witness could not be deposed in Palivos' divorce proceedings. The United States claims that Palivos went to the witness' apartment with $10,000 in $100 bills and urged the witness to leave the state

temporarily. The witness did go to Ohio, but returned right away and allegedly did not tell Palivos because the witness was afraid of what Palivos might do.

## DISCUSSION

The United States moves to admit the evidence above concerning Palivos' actions in the 1991 federal law suit and his alleged offer of $10,000 to his mistress to leave town to avoid a deposition. The United States submits that these incidents are "other acts" which are admissible under Federal Rule of Evidence 404(b) so long as they are used for something other than to show a propensity to commit crime. Rule 404(b) provides,

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

The United States argues that the actions listed above do not go toward Palivos' propensity to obstruct justice but rather establish his *modus operandi* or pattern of behavior when Palivos is confronted with the consequences of his illegal or immoral behavior. It also claims that the actions are relevant to his intent and motivation.

Under the traditional four-part test, evidence of other acts is admissible under Rule 404(b) when

> (1) the evidence is directed toward establishing a matter in issue other than the defendant's propensity to commit the crime charged, (2) the evidence shows that the other act is similar enough and close enough in time to be relevant to the matter in issue, (3) the evidence is sufficient to support a jury finding that the defendant committed the similar act, and (4) the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice.

*United States* v. *Thomas*, 321 F.3d 627, 633 (7th Cir. 2003); *United States* v. *Heath*, 188 F.3d 916, 921 (7th Cir. 1999); *United States* v. *Asher*, 178 F.3d 486, 492 (7th Cir. 1999).

*1.    The 1991 Federal Lawsuit*

Starting with factor one, whether the evidence is directed toward establishing a matter in issue other than the defendant's propensity to commit the crime charged, the United States argues that the evidence goes toward Peter Palivos' *modus operandi* and pattern of obstructing justice and his intent to obstruct justice. *Modus operandi* is "evidence that shows a defendant's distinctive method of operation." *United States* v. *Robinson*, 161 F.3d 463, 467 (7th Cir. 1998). While not expressly listed as a 404(b) exception, it falls within 404(b)'s "identity" exception. *United States* v. *Rollins*, 301 F.3d 511, 518 n.3 (7th Cir. 2002).  For evidence to be admissible as proof of *modus operandi*, it must bear " a *singular* strong resemblance to the pattern of the offense charged" with the similarities between the two crimes "sufficiently idiosyncratic to permit an inference of pattern for purposes of proof." *United States* v. *Thomas*, 321 F.3d 627, 634-35 (7th Cir. 2003), quoting *United States* v. *Smith*, 103 F.3d 600, 603 (7th Cir. 1996) (emphasis in original).  The Seventh Circuit has cautioned that if evidence of generic patterns were allowed to establish *modus operandi* "this fairly limited exception to Rule 404(b) would gut the Rule, rendering it useless as a check on character evidence that would otherwise be inadmissible." *Thomas*, 312 F.3d at 635.

The United States simply states that the actions in the 1991 civil proceedings are relevant to the obstruction of justice charge here because Palivos "is alleged to have done precisely what he did in 1991–fabricate documents and submit them in a federal court proceeding in order to extricate himself from trouble."  The only similarities between the actions is that in each case Palivos allegedly attempted to obstruct justice by falsifying documents.  There is no direct similarity between the manners in which the alleged actions were undertaken.  Nor is anything

10

idiosyncratic or peculiar about the manner in which the conduct was performed to suggest an inference of a pattern of proof. The actions are nothing more than Palivos' allegedly obstructing justice on more than one occasion. Such a generic showing of *modus operandi* would, in essence, allow any criminal acts which have been performed on more than one occasion to become a proof of a pattern, and "can only lead to an inference of propensity that is improper under Rule 404(b)." *Thomas*, 321 F.3d at 635.

Moreover, even if the evidence could be admitted to show something other than Palivos' propensity to commit obstruction of justice, the other prongs of the test are not as clearly satisfied as the United States suggests. With respect to factor two, Palivos is alleged to have conspired to commit obstruction of justice in this case in November 2000. The matter before Judge Marovich took place in a 1991 civil proceeding, nearly nine years earlier.[4] While greater time periods have been upheld as being sufficiently temporally related, those were in cases where the acts themselves were nearly identical. *See United States* v. *Polichemi*, 219 F.3d 698, 709-10 (7th Cir. 2000) (concluding that ten-year span between conduct and charged offense was sufficiently close in time because the two acts were nearly identical). As the court stated above, the acts here have little in common other than that they both allegedly constitute obstruction of justice through the falsification of documents. In addition, concerning factor three, while the United States claims that a jury would easily find by a preponderance of the evidence that Palivos committed the prior acts, the ARDC Hearing Panel certainly did not so find, albeit the standard of proof there was the higher clear and convincing evidence standard.

---

[4]The United States argues that Palivos continued his lies and obstruction up until February 1996 when he was before the ARDC. The court rejects this suggestion. The alleged acts of fabricating documents took place in 1991.

Finally, even if the court were to agree with the United States on the first three prongs of the test, it would still exclude the evidence because its probative value is substantially outweighed by the danger of unfair prejudice. The last factor incorporates the familiar Rule 403 factors excluding relevant evidence for prejudice, confusion or waste of time. *E.g.*, *Heath*, 188 F.3d at 921. As mentioned above, the alleged fabrications in the 1991 case would have, at best, only minimal probative value given the lack of any solid similarities between the two events. This minimal probative value would be in stark contrast to the substantial prejudice Palivos would face with the introduction of evidence that he allegedly knowingly lied to a federal judge. This could reasonably cause a jury to infer a propensity to be dishonest or untruthful and cause the jury to convict Palivos in this case on the improper ground of his prior actions. The court must also be mindful that most of the allegations concerning the alleged fabrications and lies in the 1991 case are hotly disputed by Palivos, thereby raising the specter of a mini-trial on this issue, with the end result being jury confusion and waste of time. For these reasons, the court denies the United States' motion to admit the 1991 federal law suit evidence to show Palivos' *modus operandi*.[5]

2.    *The Offer of $10,000 to Leave Town*

The United States moves to admit this evidence on the same grounds as above, namely, because it establishes Palivos' *modus operandi* and goes to his intent. The court disagrees. The

---

[5] The United States also seeks to admit the 1991 federal law suit evidence to show Palivos' intent. "Where 404(b) evidence is offered to prove intent, the test requires that the prior bad act have some connection with the defendant's intent to commit the charged crime." *United States* v. *Macey*, 8 F.3d 462, 466 (7th Cir. 1993). The court sees no link between Palivos' alleged indiscretions in the 1991 case and the charges here. In fact, at best, all the conduct shows is that Palivos is willing to obstruct justice when his conduct is being questioned. That is insufficient. *See Macey*, 8 F.3d at 466 ("If anything, Plesniak's testimony demonstrates only that, in a pinch, Macey was willing to break the law. That is exactly the type of evidence Rule 404 seeks to preclude."). In addition, as noted above, even if such connection were shown, the court would be persuaded that any minimal probative value afforded by admission of the evidence would be substantially outweighed by the prejudice to Palivos.

*modus operandi* argument again fails at factor one, as there is absolutely no similarity between the obstruction charge Palivos faces here and his alleged offer to a potential witness of $10,000 to leave town. Even if both actions were obstruction of justice, committing on two occasions obstruction of justice does not establish *modus operandi* but, instead, suggests propensity to commit crime. Moreover, the government presents no persuasive reason why this evidence is sufficiently connected with the actions charged in the indictment to establish Palivos' intent. The United States' argument on this ground is also rejected. [6]

## CONCLUSION

For the reasons stated above, the United States' motion to admit "other act" evidence pursuant to Rule 404(b) is denied [#121].

ENTER: _____

JOAN HUMPHREY LEFKOW
United States District Judge

Dated: September 15, 2003

---

[6]The government also moves *in limine* to bar any references to the ARDC Hearing result or to the lack of finding of fabrication by Judge Marovich. These issues would appear moot since the court denies the United States' motion to admit evidence under the Rule 404(b) exceptions, but, in any event, the evidence is irrelevant and the motion *in limine* is granted.

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| vs. | ) | No. 00 CR 1065 |
| | ) | Judge Joan H. Lefkow |
| PETER BOUZANIS, GEORGE PALIVOS, | ) | |
| JACPG, INC., PETER PALIVOS and | ) | |
| LOUIS MARIN, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

Defendant, JACPG, Inc. ("JACPG"), a dissolved Illinois corporation, has been indicted

by the United States of America ("United States" or "government") on charges of conspiracy to

defraud the Small Business Administration ("SBA")(Count I), of a wire and mail fraud scheme

(Counts II and III), and of bankruptcy fraud (Count V). Also charged in the Fifth Superseding

Indictment are defendants Peter Bouzanis ("Bouzanis"), a fugitive, George Palivos, also a

fugitive, Peter Palivos, and Louis Marin ("Marin"). Trial is set to begin for JACPG, Peter

Palivos, and Marin on September 16, 2003. Before the Court are (1) JACPG's motion to sever

the charges against JACPG from the charges against Marin, (2) the government's motion *in*

*limine* to introduce a redacted statement of Marin at trial, and (3) the government's evidentiary

proffer supporting the admissibility of coconspirator statements ("*Santiago* proffer").

For the reasons that follow, (1) JACPG's motion to sever is denied, (2) the government's

motion to introduce Marin's redacted statement is denied without prejudice, and (3) the

government's *Santiago* proffer is granted.

129

# BACKGROUND[1]

In or around November 1995, JACPG, the owner of the Waterfalls Restaurant in Antioch, Illinois, agreed to sell the restaurant and its assets to Bouzanis. The purchase price agreed on at the time was $1,600,000. Marin was a financial consultant who assisted Bouzanis in locating prospective lenders for Bouzanis' planned purchase of the restaurant. Marin assisted Bouzanis in gathering and preparing materials for submission to these prospective lenders. In or around December 1995, a proposed loan package prepared for a lender by Marin in support of Bouzanis' purchase was declined because of Bouzanis' financial condition and income history.

Around the same time, Bouzanis, with Marin's assistance, inquired about obtaining a SBA-guaranteed loan from The Money Store to finance the purchase of the restaurant. To secure this loan, Marin assisted Bouzanis in preparing documents, including a false tax return that was filed with the Internal Revenue Service, that inflated Bouzanis' income history. Marin then assisted Bouzanis in providing this false information to The Money Store.

The loan ultimately sought by Bouzanis from The Money Store was $1,250,000. Bouzanis represented to The Money Store that his down payment would be financed with an inheritance he received from his father in the amount of $400,000. The United States alleges that no inheritance in that amount ever existed. The Money Store apparently tentatively approved Bouzanis for a loan to purchase Waterfalls from JACPG.

In early March 1996, The Money Store notified the parties that the loan-to-value ratio for the loan needed to be reduced from 80% to 70%. Thereafter, Nicholas Black ("Black"), the real

---

[1]The facts for the Background section are taken from the Indictment. No findings of fact are made or implied, though the statements are made affirmatively rather than with the constant use of the term "alleged."

2

estate attorney for JACPG,[2] informed the Money Store that the parties would decrease the loan-to-value ratio by increasing the purchase price of the restaurant to $1.785 million and have JACPG finance the difference through a $215,000 second mortgage and note to Bouzanis. Thereafter, Bouzanis obtained the $1.25 million dollar loan from the Money Store.

On April 24, 1996, the day of the closing, Bouzanis, George Palivos, and Individual C went to Broadway Bank in Chicago, where Bouzanis obtained a five-day interest-free loan secured by Individual C's accounts. After payment of the loan fee, Bouzanis cleared $354,000 from the loan, which he used to finance his downpayment at the closing later that day. The United States alleges that Black had earlier asked George Palivos about the five-day loan that Bouzanis would obtain. George Palivos told Black that the loan would be obtained from Broadway Bank and that Bouzanis would use the proceeds of the closing to pay off the loan. When Black inquired about how any payment to Bouzanis would be explained, George Palivos allegedly stated that the parties would falsely claim a purchase price dispute, and that the money paid to Bouzanis would be in settlement of that dispute.

After the closing, Black wrote a check drawn on JACPG's bank account to Bouzanis in the amount of $392,500. The United States alleges that Bouzanis used this check to pay back the five-day loan at Broadway Bank. The United States also alleges that at the urging of George Palivos, Black postdated the check to April 27, 1996, to make sure that Bouzanis would not deposit the check until the money was available from the closing in JACPG's bank account.

---

[2]Black was charged in the previous indictments in this case. He has pled guilty and will testify as a government witness at trial.

3

Black wrote on the check "Settlement in Full of All Claims and Disputes Re: Waterfalls Restaurant."

After the closing, apparently on April 26, one of Black's associates prepared a letter by George Palivos on Black's letterhead that purported to "settle" the fictitious purchase price dispute. The letter explained that the "settlement" of the alleged dispute would be a payment of $392,500 to Bouzanis, and a forgiveness of the $215,000 second mortgage. In early 1997, the Waterfalls restaurant went into receivership; Bouzanis declared bankruptcy shortly thereafter.

On October 20, 2000, Black was served with a federal grand jury subpoena to produce documents relating to the Waterfalls Restaurant sales transaction. Black told the Palivos brothers that the Waterfalls investigation had focused on the documents surrounding the fictitious purchase price dispute, including the April 26 letter. George Palivos asked that Black send him a copy of whatever Black produced in response to the subpoena. Later, while at George and Peter Palivos' law firm on a separate matter, Black was asked by George Palivos if the file had been found yet. When Black replied that he had not yet found the file, Peter Palivos allegedly told Black that it would be "nice if there were notes in the file" explaining how at around the time of the closing George Palivos wanted a $25,000 check as the payoff for inventory, but wanted the payee left blank because he might give the check to Peter Palivos because George owed money to Peter. Peter Palivos further told Black that it would also be "nice" if there were notes in Black's file that documented the alleged purchase price disputes surrounding the condition of the restaurant.

On November 3, 2000, Black located the file for the Waterfalls Restaurant deal at his office. The United States maintains that the file did not contain any of the notes described above.

4

Thereafter, Black was again at George and Peter Palivos' law firm and again spoke to Peter Palivos about the notes. Peter Palivos allegedly instructed Black to find six-year old paper and a six year old pen to create the notes, which Black understood to mean old paper and an old pen. Later, Black once again met with Peter Palivos and told him that he had found a legal pad and a pen which he thought were old enough. Peter Palivos allegedly told Black to write the notes. Peter Palivos also allegedly instructed Black to rub the ink on the paper against something so that no one would be able to tell when it was written.

On approximately November 14 or 15, 2000, Black wrote out two handwritten notes with the information related to him by George and Peter Palivos regarding the purchase price dispute and the $25,000 check to Peter Palivos. Black allegedly knew that the entire purchase price dispute was fictitious and was just a way to explain why it was that the sellers gave Bouzanis money after closing so that Bouzanis could pay off the five-day loan at Broadway Bank, and to help Peter Palivos explain why he received $25,000 from Bouzanis after the closing.

On November 15, 2000, Black delivered the file containing the fabricated notes in response to the grand jury subpoena served on October 20, 2000. Later that evening Black went to dinner with Peter Palivos and gave Peter a copy of the documents that he had produced in response to the subpoena. When Peter Palivos saw the two handwritten notes that Black had fabricated, he said "thank you" and told Black that he appreciated what Black had done.

Subsequently, the grand jury ordered Black and others to submit handwriting exemplars, and the notes were submitted for forensic analysis. The analysis revealed that the notes Black produced in response to the grand jury subpoena had been fabricated after 1997, a year after they were dated and purportedly written. Peter Palivos was later indicted on the charges here of

5

obstruction of justice and conspiracy to obstruct justice. He is not charged with having any involvement in the separate conspiracy set forth in the indictment concerning the allegedly fraudulent sale of the Waterfalls Restaurant.

## I. JACPG's Motion for Severance From Marin

JACPG argues that the joinder of charges against JACPG and Marin is improper under Rule 8(b) of the Federal Rules of Criminal Procedure. JACPG argues further that the joinder is prejudicial under Rule 14 of the Federal Rules of Criminal Procedure because it violates JACPG's constitutional right to due process and to confront witnesses as recognized by *Bruton* v. *United States*, 391 U.S. 123, 137 (1968). In particular, JACPG argues that the introduction of statements made by Marin to two Special Agents of the SBA inculpating George Palivos in the conspiracy charged in Count One of the Indictment and the scheme to defraud charged in Counts Two and Three of the Indictment would violate JACPG's rights to due process and to confront the witnesses against it, as recognized in *Bruton*.[3] Thus, JACPG argues that severance is proper. Alternatively, JACPG argues that if the court denies the motion for severance, the court should not admit Marin's statement unless it is significantly redacted.

---

[3] The court understands the Government's position to be that the criminal liability of the corporate defendant JACPG is premised on the actions of George Palivos, John Katris, and Chris Katris. Thus, evidence inculpating these three persons in the conduct charged in the Counts against JACPG would be introduced for the purpose of inculpating JACPG.

## A. Rule 8(b)

Defendant JACPG argues that Rule 8(b) of the Federal Rules of Criminal Procedure,

which governs the joinder of two or more defendants in the same indictment, requires severance

of the counts against JACPG from the count against Marin. Rule 8(b) provides

> Joinder of Defendants: Two or more defendants may be charged in the same
> indictment or information if they are alleged to have participated in the same act
> or transaction or in the same series of acts or transactions constituting an offense
> or offenses. Such defendants may be charged in one or more counts together or
> separately, and all of the defendants need not be charged in each count.

JACPG contends that severance is proper because Marin is not charged in any of the fraud counts

against the other defendants and no other defendant is charged with Marin in the tax fraud count.

Moreover, the descriptions of the charges against JACPG in Counts One, Two, Three, and Five

do not allege the participation of Marin, nor does the description of the charge against Marin

directly allege the participation of JACPG.

The test set forth in Rule 8(b) is whether the indictment "alleges" that the defendant

"participated in the same act or transaction or in the same series of acts or transactions

constituting an offense or offenses." It is not necessary or sufficient under Rule 8(b) that the

defendants be charged with identical crimes. *United States* v. *Marzano*, 160 F.3d 399, 401 (7th

Cir. 1998). Rather, the defendants must be charged with crimes that "well up out of the same

series of such acts, but they need not be the same crimes." *Id.* (citing *United States* v. *Curry*,

977 F.2d 1042, 1049 (7th Cir. 1992); *United States* v. *Sophie*, 900 F.2d 1064, 1084 (7th Cir.

1990)). The simplest case for joinder is where the defendants are charged with having conspired

with each other, period, and thus, in the language of the first clause of the rule, with having

"participated in the same act or transaction." *Id.* The Indictment does not charge that Marin

"participated in the same act or transaction" with JACPG or Peter Palivos. Marin is charged, alone, with aiding and abetting the preparation and presentation of a false and fraudulent United States individual income tax return to the Internal Revenue Service on behalf of Peter Bouzanis. If that offense is unrelated to the conspiracy and fraud charges against JACPG, it could not be properly joined with the conspiracy and fraud charges against JACPG under Rule 8(b).

Thus, the second rather than the first clause of Rule 8(b) is implicated. The court must decide if the tax fraud offense can be considered part of the "same series of acts or transactions" as the conspiracy and fraud offenses with which JACPG is charged. *Marzano*, 160 F.3d at 401. In *Marzano*, Charles Marzano was involved in a drug conspiracy with a bank officer who embezzled money from his bank and invested it in the drug conspiracy. The conspirators decided to launder the funds from their drug and embezzlement schemes through the commodity trading firm of Charles' cousin Daniel Marzano. A single indictment charged Charles Marzano with drug offenses, and charged him and his cousin Daniel Marzano with laundering money. *Id.* at 400. Though the indictment did not specifically link Charles' drug crimes with Daniel's money laundering[4], and despite the fact that Daniel never laundered money derived from Charles' drug crimes, Judge Posner concluded that "a chain or circle . . . connects at one end Charles Marzano's drug dealings in which his cousin was not involved and at the other end the cousin's laundering of the proceeds of [the embezzlement scheme] incident to the drug conspiracy. Thus, the court held that there was no misjoinder. *Id.* at 401.

---

[4]Judge Ripple reasoned that the district court erred in allowing joinder of the charges against Daniel Marzano and Charles Marzano because the indictment made no attempt to link the money laundering scheme with the drug charges. 160 F.3d at 403-04 (Ripple, J., concurring on other grounds). In the instant case, the Government specifically alleges a link between the tax fraud charges against Marin and the conspiracy between Bouzanis, George Palivos, and JACPG.

Compared to *Marzano*, an even stronger "chain or circle" connects the tax fraud charges against Marin with the alleged conspiracy between Bouzanis, George Palivos, and JACPG. Count Eight of the Fifth Indictment alleges that Marin assisted Bouzanis in submitting false information to The Money Store, including information that inflated Bouzanis' income history, by falsifying Bouzanis' tax returns. Count One of the Indictment alleges that Bouzanis, George Palivos, and JACPG conspired to defraud The Money Store and the SBA by making material misstatements and omissions and creating materially false pretenses in order to obtain and keep the loan from The Money Store and to complete the sale of the Waterfalls Restaurant to Bouzanis. Thus, the Indictment alleges that the tax fraud charge against Marin is part of the "same series of acts or transactions" as the conspiracy and fraud offenses with which JACPG is charged. Consequently, joinder is proper under Rule 8(b).

## B. Marin's Statement and *Bruton* Concerns

Marin was interviewed by two Special Agents of the SBA on September 19, 2001, and signed a written statement on that date. In his statement, Marin makes several statements inculpating George Palivos in the conspiracy charged in Count One of the Indictment and the scheme to defraud charged in Counts Two and Three of the Indictment. The government seeks to submit a redacted version of Marin's statement, with George Palivos' name replaced with the words "Individual A," as evidence against Marin. Counsel for Marin has confirmed that Marin will not testify during the trial of this case. Thus, JACPG contends that Marin's statement violates JACPG's constitutional rights to due process and to confront witnesses against it, as recognized in *Bruton*, 391 U.S. at 137, and *Gray* v. *Maryland*, 523 U.S. 185, 195 (1998). JACPG argues that the court either should sever the charges against JACPG from the charges

against Marin or should significantly redact Marin's statement to prevent the jury from improperly identifying "Individual A" as George Palivos.

In *Bruton*, the U.S. Supreme Court held that the admission of a codefendant's confession that implicated the defendant at a joint trial constituted a prejudicial error even though the trial court gave clear, concise, and understandable instructions to the jury that the confession could only be used against the codefendant and must be disregarded with respect to the defendant. *Id.* In *Gray* v. *Maryland*, the Court held that a redacted confession by a codefendant that replaces the defendant's name with an obvious blank, the word "delete," a symbol, or similarly notifies the jury that a name has been deleted is similar enough to *Bruton*'s unredacted confessions as to warrant the same legal results. 523 U.S. 185, 195 (1998).

The government has submitted a proposed redacted version of Marin's statement that replaces George Palivos' name with the words "Individual A." The government argues in its motion *in limine* to admit Marin's redacted statement that the redactions satisfy the concerns raised by *Bruton* and *Gray*. The government relies on the recent Seventh Circuit case of *United States* v. *Sutton*, 337 F.3d 792 (7th Cir. 2003). In *Sutton*, the court held that the substitution of the words "another individual" for the defendant's name did not create an improper identification. However, the Court's decision in *Sutton* was based on the fact that there were numerous people involved in the various crimes described in the redacted statement. The court stated

> In the present case there were drivers, gun suppliers, and co-conspirators of all kinds, with different individuals involved in different roles for different crimes. "Another individual" could refer to many people besides [the defendants].

10

*Id.* at 800. The Indictment here, however, does not involve a great number of people. Based on the proposed redacted statement, the jury could easily identify "Individual A" as George Palivos. Furthermore, the proposed redaction submitted by the government is handwritten, but the words "Individual A" are typewritten. This sort of obvious redaction does not satisfy *Gray*'s more general prohibition against redactions that replace names with "a symbol or other similarly obvious indications of alteration . . . that . . . so closely resemble *Bruton*'s unredacted statements that, in our view, the law must require the same result." 523 U.S. at 192. Thus, the court denies the government's motion to use the proposed redacted statement of Marin without prejudice and with leave to submit a document with redactions that are more carefully designed to avoid the problems JACPG identifies.

## II. Government's *Santiago* Proffer

Before the court is the government's pretrial written proffer submitted pursuant to *United States v. Santiago*, 582 F.2d 1128 (7th Cir. 1978). The proffer summarizes the evidence that the government expects to adduce at trial in order to establish that a conspiracy existed between defendants JACPG, Peter Bouzanis, George Palivos, and Peter Palivos. Under Federal Rule of Evidence 801(d)(2)(E), statements made by a co-conspirator of a defendant during the course of and in furtherance of the conspiracy are not hearsay when offered against the defendant. Before allowing these statements into evidence, however, the government must demonstrate by a preponderance of the evidence that as to each defendant "(1) a conspiracy existed, (2) the defendant and the declarant were members thereof, and (3) the proffered statements were made during the course of and in furtherance of the conspiracy." *Bourjaily* v. *United States*, 483 U.S.

171, 181 (1987).  In making this determination, the court "may examine hearsay statements sought to be admitted." *Id.*

In determining whether a statement was made "in furtherance of the conspiracy," all that is necessary is a reasonable basis upon which the court could conclude that the statement furthered the objectives of the conspiracy. *United States* v. *Shoffner*, 826 F.2d 619, 628 (7th Cir. 1987).  Under this standard, a statement can be considered "in furtherance of the conspiracy" even though it is susceptible to different interpretations or was not made exclusively (or even primarily) to further the conspiracy's objectives. *Id.*

Statements that further the objectives of the conspiracy include those that (1) are an attempt to recruit coconspirators, *see id.*, (2) seek to control damage to an ongoing conspiracy, *see United States* v. *Van Daal Wyk*, 840 F.2d 494, 499 (7th Cir. 1988), (3) are made to keep co-conspirators advised of the progress of the conspiracy, *see United States* v. *Potts*, 840 F.2d 368, 371 (7th Cir. 1987), or (4) attempt to conceal the conspiracy, *see United States* v. *Kaden*, 819 F.2d 813, 820 (7th Cir. 1987).

After considering the proffered facts, the court has preliminarily concluded that the government has established by a preponderance of the evidence that the co-conspirator statements at issue fall within the scope of Rule 801(d)(2)(E).  In particular, the grand jury testimony of Nicholas Black in combination with the falsified notes produced in response to the grand jury subpoena show the existence of a conspiracy concerning the "purchase price dispute," which is at the heart of the fraud and subsequent obstruction charges.  Based upon the written *Santiago* proffer, it is more likely than not that a conspiracy existed between JACPG, Bouzanis,

12

George Palivos, Peter Palivos, and Nicholas Black,[5] that these individuals participated in the conspiracy, and that statements were made "during the course and in furtherance of the conspiracy." Therefore, the court rules that co-conspirator statements are admissible conditionally pursuant to Rule 801(d)(3)(E) subject to proof of conspiracy at trial. *See Santiago*, 582 F.2d at 1131. The court will make a final determination as to the admissibility of the specific statements at the appropriate time. If the government fails to elicit the testimony outlined in the *Santiago* proffer, the court will entertain objections to those statements at that time.

## CONCLUSION

For the reasons stated above, (1) JACPG's motion to sever the charges against JACPG from the charges against Marin is denied (#122); (2) Government's motion *in limine* to introduce the proposed redacted statement by Marin is denied without prejudice (#120); and (3) Government's *Santiago* proffer is granted (#119).

ENTER:  _____
JOAN HUMPHREY LEFKOW
United States District Judge

Dated: September 15, 2003

---

[5]The Indictment does not charge Peter Palivos with participating in the conspiracy to defraud. However, the Government has shown by a preponderance of the evidence that Peter Palivos and Nicholas Black attempted to conceal the conspiracy by producing false documents related to the purchase price dispute in response to the grand jury subpoena. Thus, any statements made in connection with that attempt to conceal the conspiracy are "in furtherance of" the larger conspiracy to defraud. *See United States* v. *Kaden*, 819 F.2d 813, 820 (7th Cir. 1987). It is not a condition for the admission of co-conspirator statements under Rule 801(d)(2)(E) that the defendant be on trial for the conspiracy charge. *United States* v. *Cox*, 923 F.2d 519526 (7th Cir. 1991).