A5

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| vs. ) | No. 00 CR 1065 |
| ) | Judge Joan H. Lefkow |
| PETER BOUZANIS, GEORGE PALIVOS, ) | |
| JACPG, INC., PETER PALIVOS and ) | |
| LOUIS MARIN, ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM OPINION AND ORDER

Before the court is yet another round of post-trial motions filed by defendant Peter Palivos ("Palivos"). The present motion is styled "Motion for an Order for a Rule to Show Cause Why AUSA William Hogan, Former AUSA Eric Wilson, AUSA Marsha McClellan, Attorney Elliot M. Samuels, and Federal Agent Thomas Heinzer Should Not Be Held in Contempt for Perpetrating a Fraud Upon the Court in this Case, and in Covering Up that Fraud." Alternatively, Palivos requests an evidentiary hearing. On September 5, 2005, Palivos filed "Memorandum of Law in Support of Defendant Peter Palivos's Motions to Vacate His Conviction, for a New Trial under *Banks v. Dretke, Brady, and Giglio*, and for a Rule to Show Cause." No accompanying motion is of record. For the reasons set forth below, the motion is (or motions are) denied.

## DISCUSSION

The details concerning the underlying transaction and the backdated notes that formed an

evidentiary basis for Palivos's conviction have been examined by the court in detail in other opinions and will not be set forth again here. *See United States v. Bouzanis*, No. 00 CR 1065, 2003 WL 22143275 (N.D. Ill. 2003). Palivos's present motion arises out of the alleged recent discovery of evidence arising from Nicholas Black's deposition testimony given during June, 2005 in relation to an attorney disciplinary proceeding against George Palivos. In his reply memorandum Palivos further relies on two documents obtained from the government in August 2005[1] that, Palivos argues, expose deliberate prosecutorial misconduct and a scheme involving the prosecutors, Nick Black's lawyer, and the investigating agents to conceal that misconduct.

I. **Motion for Order for a Rule to Show Cause Why Certain Individuals Should Not Be Held in Contempt.**

Palivos asks this court to hold the prosecutors, Samuels, and the investigating agents in criminal contempt. Federal Rule of Criminal Procedure 42(a) provides that "[a]ny person who commits criminal contempt may be punished for that contempt after prosecution on notice." Federal Rule of Criminal Procedure 42(a)(1) authorizes the court to initiate a criminal contempt prosecution by issuing an order to show cause. In this case, however, there is no basis for finding any representative of the government or Samuels in criminal contempt.

### A. The Government Did Not Mislead Black About the Results of the Forensic Analysis.

Palivos argues that the February 13, 2003 letter from Samuels to Black, as well as Black's

---

[1] The alleged newly discovered evidence was obtained on August 1, 2005 from the United States Attorney's Office through discovery in the government's civil lawsuit against Palivos. In an authenticating affidavit submitted in support of Palivos's motion, another of Palivos's attorneys, Sam Pranger Jr., avers that the government produced a February 24, 2003 letter from Nicholas Black to his attorney, Elliot Samuels ("Samuels"), as well as a March 4, 2003 letter from F.B.I. Special Agent Thomas Heinzer to Samuels. *See* Pranger Aff. at ¶ 4.

2

June 2005 deposition testimony, establishes that the government falsely advised Black that it had performed a forensic analysis on the notes that allowed the government to determine that the notes were created in 2000 and not in 1996 as Black initially maintained. There is, however, no evidence that the government ever represented to Black or his lawyer that the notes were created in 2000. Rather, the government represented that the notes were created after the real estate closing at issue.

The single communication to which Palivos attaches his argument was addressed in rulings on previous post trial motions, namely that Samuels wrote in the February 13, 2003 letter,

> "Regarding these documents, it was represented by certain government agents that scientific, forensic tests had conclusively established that the documents were recently prepared and added to your file and, therefore, were not genuine."

Samuels, however, gave an affidavit submitted in support of the government's opposition to Palivos's earlier motion to vacate his conviction that the February 13, 2003 letter's allegations of prosecutorial misconduct in the letter were not true. Samuels Aff. ¶ 3. Samuels' response to Palivos's current motion again disavows the allegations made in the February 13, 2003 letter. *See* Response to Palivos's Motion for Rule to Show Cause filed by Elliot M. Samuels (Aug. 10, 2005) at 2. Samuels' statements, Black's trial and deposition testimony,[2] and the government's response are all consistent with the position that the government agents believed that the notes

---

[2] Black admitted that he has no first-hand knowledge of the government's representations about its forensic evidence. Indeed, Black admitted that he never spoke to anyone from the government about the forensic evidence before he pled guilty. *See Dep. tr.* at 66 (stating that the conversations about the notes were between Samuels and the government) and 83 (Black was not a party to the conversations between Samuels and the government). Although Black may have assumed that the government's laboratory analysis allowed the government to conclusively date the notes, there is no evidence that the government ever made that representation.

were created after July 1997, but not specifically 2000.³ In any event, the government did not hide the fact that the notes had been sent to a lab; there is no suggestion in the record that Black ever asked to review the lab report before he decided to cooperate. There is simply no merit to Palivos's argument.

### B. The Government Did Not Induce Black to Testify By Promising Him a "Free-Fall Departure" from the Sentencing Guidelines.

Palivos argues that the government violated *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L.Ed.2d 215 by failing to disclose that it promised Black a "free-fall departure" from the sentencing guidelines in exchange for his testimony before the grand jury and at trial.

In order to establish a *Brady* violation, Palivos must show that "(1) that the prosecution suppressed evidence; (2) that the evidence was favorable to the defense; and (3) that the evidence was material to an issue at trial." *United States v. Silva*, 71 F.3d 667, 670 (7th Cir. 1995).

This argument is facially absurd. The plea agreement states precisely what promises were made to Black and that there are no other agreements. If any side agreements had been made, they were rendered void by the plea agreement. The plea agreement merely provides that the government will recommend a departure from the sentencing guidelines. *See* Plea Agreement at ¶ 16. It reserves the right for Black to request a "free-fall departure," but it does not obligate the government to support Black's request nor preclude the government from opposing it. *See Id.* Palivos's counsel cross-examined Black on this issue at trial and though Black testified he

---

³Palivos fails to acknowledge that the test results revealed an indentation on the notes that indicated that the paper directly above the notes had a date reference to July 1997. The jury could have thus reasonably concluded, without Black's testimony, that the notes were created after July 1997.

4

hoped he would not go to jail, his testimony clearly contemplated that a jail sentence remained a possibility. *See* Trial Testimony of Nick Black (Oct. 1, 2003 at 113-113; 122-123). Thus, Black's trial testimony supports the government's contention that it did not promise Black a "free-fall departure."

Furthermore, Black's June 2005 deposition does not support Palivos's allegation of an illicit agreement between Black and the government guaranteeing Black a "free-fall departure" from the sentencing guidelines. Notably, Black was not specifically questioned about the government's promised sentencing recommendations during his deposition. Rather, at the end of a long soliloquy regarding the purpose of Samuels' February 13, 2003 letter, Black testified that "...the plea agreement is a contract. I have to honor my side of the contract...I signed a contract that said I will do A, B, C...And, in return, they would give me a free-fall departure." *See* ARDC Tr. at 81. Contrary to Palivos's argument, Black's testimony does not suggest that he and the government entered into a separate, undisclosed agreement whereby the government promised to recommend that Black not go to jail. Instead, Black's testimony appears to be an imprecise characterization of the government's promise in the plea agreement to recommend a departure from the sentencing guidelines.[4]

### C. The Government Provided Black's Attorney With the Test Results Before Black Pled Guilty.

Palivos argues that Heinzer's March 4, 2003 letter to Samuels demonstrates that the government withheld the test results until after Black pled guilty (in June, 2002) in order to lock

---

[4]While Black is a formerly licensed attorney, there is no evidence that he has any experience in criminal matters or with the sentencing guidelines.

in Black's testimony before the grand jury while he remained under the mistaken impression that the government could independently date the notes.

The March 4, 2003 letter states in full:

"Eric Wilson relayed to me your request for photocopies of the IRS examination reports pertaining to the document analysis of records obtained in our investigation. Please find the enclosed reports, Bates labeled 012139 through 012152, (00CR1065)."

This letter is insufficient to rebut the government's contention that it produced the test results ten months prior to Black's plea. The government's contention is supported by Samuels, who recollects that he received the test results sometime "in the spring or summer of 2001."[5] *See* Response to Palivos's Motion for Rule to Show Cause filed by Elliot M. Samuels (Aug. 10, 2005). Certainly, the notes were produced in pretrial discovery by cover letter dated August 23, 2001 (See Exh. J to Gov't Response). The March 4, 2003, which neither states nor implies that this was the government's first production of the test results, does not contradict Samuels' recollection or the recorded memorandum of discovery.

### D. The Government Did Not Threaten to Prosecute Black for Perjury If He Recanted His Testimony That He Created the Notes in 2000.

Palivos argues that the government prevented Black from recanting his testimony that he created the notes in 2000 after he obtained the government's test results by threatening to prosecute him for perjury. Palivos provides no evidence to support this allegation. Both Samuels

---

[5] Samuels may have simply chosen not to notify Black of the test results because, as he states, he deemed them to be of minimal significance. Indeed, as the government argues, the test results merely confirmed the government's representations about its evidence against Black. Since Black had already decided to plead guilty on the basis of the government's representations, the test results which supported those representations were immaterial. Consequently, Black may have pled guilty and later drafted the February 24, 2003 unaware that Samuels' received the test results in 2001.

6

and Black state that they never approached the government about the possibility of recanting Black's testimony. Furthermore, during Black's June 2005 deposition, Black and Palivos's counsel engaged in the following exchange:

> Q. And that was because – was that because the Government was saying that you might be indicated [*sic*] for perjury.
>
> A. No, no, no. The Government did not threaten me.

ARDC Tr. 81. Thus, there is no evidence that the government threatened Black to prevent him from recanting his testimony.

### E. The Government Did Not Fail to Disclose a Meeting With Black Regarding His Intent to Recant His Testimony.

Palivos alleges that the government also violated *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L.Ed.2d 215, by failing to disclose "that it met in early 2003 with Samuels and/or Black (in early 2003) to discuss whether Black was willing to continue to cooperate with the prosecution or whether he wanted to withdraw his guilty plea..." *See* Memo. in Support of Motion to Vacate Conviction, For A New Trial, and For A Rule To Show Cause filed by Peter Palivos (Sept. 16, 2005) at 3.

Palivos fails to provide any evidence that either Samuels or Black met with the government to discuss withdrawing his guilty plea. In his June 2005 deposition, Black expressly states that he never informed the government that he was contemplating withdrawing his guilty plea. *See* ARDC Tr. at 82 (stating "I never told the Government I was thinking about doing this."). Since there is no evidence of the alleged meeting, there can be no *Brady* violation.

### F. The Government Did Not Suborn Perjurious Testimony From Black.

Palivos first argues that Black's February 24, 2003 letter, in which he states that "[d]uring one of the meetings with [F.B.I. Agent] Eric Wilson, I had stated that the roof was in poor condition," contradicts his trial testimony that he was unaware of a problem with the Waterfalls restaurant's roof. In fact, however, Black's February 24, 2003 statement is entirely consistent with Black's trial testimony.

At trial, defense counsel thoroughly cross-examined Black on the inconsistent statements Black provided the government regarding whether the parties did in fact have a legitimate purchase price dispute arising out of the condition of the restaurant. Specifically, on one representative occasion, defense counsel and Black engaged in the following exchange:

> Q. Did you not on 3/2, 3/7 and 3/19/2001 tell the agents that it was your understanding that the $392,500 check was for an agreed settlement between Bouzanis and George Palivos over the condition of the restaurant?
>
> A. Yes, I did.

*See* Trial Testimony of Nick Black (Oct. 1, 2003 at 1868). Thus, Black's February 24, 2003 letter merely confirms what Black readily admitted at trial; that he initially lied to government investigators. It does not, as Palivos suggests, demonstrate that Black lied at trial when he testified that he was unaware of a dispute between the parties concerning the condition of the roof.

Palivos also contends that the government suborned perjurious testimony from Black because, during Black's direct examination, AUSA Hogan asked the following questions and got the following answers:

> Q. Were you advised when you began the proffer sessions that there had been a determination that the notes had been examined?

8

A. Yes.

Q. And that the government knew from forensic analysis that they were not created at the time they were; that is, not in 1996?

A. Correct.

Palivos argues that Black's answer to AUSA Hogan's first question contradicts the affidavits of Bray and Heinzer, which aver that the government never discussed the results of its forensic analysis with Black. Thus, Palivos maintains, if the court accepts the government's position, it must find that AUSA Hogan suborned perjurous testimony.

On February 5, 2001, the government met with Black's then attorney, Eric Schulman, and advised him that "a laboratory analysis had been performed that led the government to believe that the handwritten notes were written well after the closing for the sale of the Waterfalls Restaurant." Bray and Heinzer Affs. ¶ 5. Nearly a month later, on March 2, 2001, Black agreed to cooperate. Black's testimony merely confirms this sequence of events.

Palivos's interpretation of AUSA Hogan's question is overly narrow. AUSA Hogan's question is broad enough to encompass two different scenarios by which Black was advised that the government performed forensic analysis on the notes: (1) that Black was personally advised by the government; or (2) that Black was advised by the government through his attorney. Thus, Black's testimony can be fairly construed as consistent with the government's position.

Palivos's contention that AUSA Hogan's second question is based on a false factual predicate is equally unfounded. Palivos argues that the government could not have known from forensic analysis that the notes were not created in 1996, because the forensic analysis was not completed until May 17, 2001.

9

Indeed, the Internal Revenue Service Crime Laboratory did not issue its report on the forensic ink analysis until May 2001. But, the laboratory did produce its report on the indentation analysis of the notes on February 2, 2001. Thus, the government knew three days before its meeting with Black's attorney that the paper that presumably would have been used before the notes were created showed a date reference to July 1997. *See* Response to Palivos's Motion for Rule to Show Cause filed by the Government (Aug. 22, 2005). This knowledge is a legitimate and accurate factual predicate to AUSA Hogan's second question.

### G. The February 13, 2003, February 24, 2003 and March 4, 2003 Letters Are Not Proof of Prosecutorial Misconduct.

Palivos next argues that the government committed *Brady* violations by deliberately suppressing the February 13, 2003, February 24, 2003 and March 4, 2003 letters in order to conceal the fact that it misrepresented the test results to induce Black to testify before the grand jury and at trial that he created the notes in 2000. Palivos cannot establish a *Brady* violation, because, as before, there is no evidence that the government actually suppressed the letters.

Palivos offers only the uncorroborated statement that either Black or Samuels produced the February 13, 2003 letter to the government. But both Black and Samuels state that they never provided the letter to the government. *See* Heinzer Aff. at 8; Response to Palivos's Motion for Rule to Show Cause filed by Elliot M. Samuels (Aug. 10, 2005) at 1. In addition, F.B.I. Special Agents Bray and Heinzer both aver that they did not have the February 13, 2003 letter before Palivos's counsel produced it as part of his post-trial motions on November 3, 2003. *See* Bray Aff. at ¶ 7; Heinzer Aff. at ¶ 7. Since there is no evidence the government suppressed the February 13, 2003

letter, there is no *Brady* violation.

Palivos likewise provides no specific evidence proving that the government had the February 24, 2003 and March 4, 2003 letters before Palivos's criminal trial. Instead, Palivos argues that the government's production of the letters in the pending civil lawsuit against him proves by itself that the government possessed the letters prior to his criminal trial. Yet, Palivos claims that the letters, "just like the February 13, 2003 letter from Samuels to Black, came to the government from Samuels' file or from Black." As noted above, both Samuels and Black state that they never produced the February 13, 2003 letter to the government. As such, there is no reason to assume that they produced the alleged newly discovered letters. These letters, like the February 13, 2003 letter, may have been obtained by the government after Palivos's criminal trial.

Palivos has not met his burden of establishing that the government suppressed the letters and thus, there is no *Brady* violation.

## II. Motion For a New Trial Under Federal Rule of Criminal Procedure 33 Based on Newly Discovered Evidence.

Palivos appears to alternatively ask this court to vacate his conviction and grant him a new trial based on the alleged recent discovery of the March 4, 2003 and February 24, 2003 letters, which Palivos maintains "could have destroyed the central predicate of the government's case at trial, which was that Black changed from his November 2000 302 statement that he wrote the notes at the time of the Waterfalls transaction (1996-1997) to the year 2000 (his testimony before the grand jury in April 2001) after being confronted with the test results." *See* Reply to Palivos's Motion for Rule to Show Cause filed by Peter Palivos (Sept. 2, 2005).

The court denied an earlier post-trial motion seeking to vacate his conviction and obtain a new trial finding that none of the evidence cited in support of his motion was newly discovered and as a consequence, his motion was untimely pursuant to Federal Rules of Criminal Procedure 29 and 33. *See United States v. Bouzanis*, No. 00 CR 1065, 2004 WL 2065051 (N.D. Ill. Aug. 30, 2004). In ruling on that motion, the court noted that the one statutory exception that would allow the court to consider Palivos's theory of prosecutorial misconduct was the discovery of new evidence. Palivos argues that he has now made such a discovery. *See Id.* at *3.

As previously iterated in this court's August 30, 2004 Memorandum Opinion and Order, the Seventh Circuit has held that there are two tests to determine whether a new trial is warranted based on newly-discovered evidence:

> Under the "general test," [t]he defendant must show that the evidence (1) came to his knowledge only after trial; (2) could not have been discovered sooner and [he] exercised due diligence; (3) is material, and not merely impeaching or cumulative; and (4) would probably lead to an acquittal in the event of retrial. However, when faced with a claim that a witness testified falsely, the district court is to employ the more lenient test more recently set forth in *United States v. Reed* (citations omitted). Under *Reed*, a new trial should be granted when: (a) The court is reasonably well satisfied that the testimony given by a material witness is false. (b) The jury might have reached a different conclusion absent the false testimony by a material witness or if it had known that testimony by a material witness was false. (c) The party seeking the new trial was taken by surprise when the false testimony was given and was unable to meet it or did not know of its falsity until after the trial.

*United States v. Furth*, 36 F.3d 649, 651 (7th Cir. 1994) (citations omitted). Under either test, "mere speculation or conjecture is insufficient to warrant a new trial." *Id.*

The March 4, 2003 and February 24, 2003 letters that Palivos now relies upon to support his prosecutorial misconduct claim are not newly discovered evidence. The facts underlying this argument have been the basis for several previously filed post-trial motions. *Id.*

In Palivos's initial post-trial motion for judgment of acquittal or for a new trial and his

12

supplement to that motion, Palivos submitted the affidavit of Demetrios Kozonis. Kozonis averred in his affidavit that Black told him that "he wanted to recant his testimony because the government had misled him and his attorney, Elliot Samuels." Kozonis Aff. ¶ 6. Kozonis also averred that during a meeting with Black and Samuels, Black told Samuels that "he was angry at AUSA Wilson and the agents because they lied to Nick Black and Elliot Samuels about what the forensic test results showed." *Id.* at ¶ 7. When ruling on Palivos's initial motion, the court stated:

> "[T]he court is not convinced that through due diligence Kozonis' testimony could not have been discovered sooner. Palivos' counsel was certainly aware that Kozonis' [sic] had information relating to this case and there was no impediment to his testifying at trial. *United States v. Bouzanis et al.*, No. 00 CR 1065, 2003 WL 22143275, at *7-8 (N.D. Ill. May 24, 2004).

Thus, in that ruling, the court concluded that the allegations of prosecutorial misconduct in the March 4, 2003 and the February 24, 2003 letters could have been discovered before trial.

The court reaffirmed that finding when ruling on a subsequent post-trial filing by Palivos. In that post-trial motion, Palivos argued that Samuels' February 13, 2003 letter evidenced the same prosecutorial misconduct and thus, warranted a new trial. The court rejected Palivos's argument, observing that "[t]he current motion is more an attempt by new counsel to argue a different theory based on facts which were present to previous counsel." *United States v. Bouzanis et al.*, No. 00 CR 1065, 2004 WL 2065051 at *3 (N.D. Ill. Aug. 30, 2004).

The alleged newly discovered letters do not appreciably alter the factual predicate for the prosecutorial misconduct claim that Palivos has now argued in several post-trial motions. Palivos could have discovered before trial that Black alleged that the government misrepresented the nature of its test results and that Black considered withdrawing his guilty plea. If Palivos had exercised due diligence, the March 4, 2003 and February 24, 2003 letters could have themselves been

13

discovered or, at a minimum, been rendered cumulative by virtue of Palivos's discovery of the February 13, 2003 letter or Kozonis' testimony. Again, since the facts underlying Palivos's claim for prosecutorial misconduct are not newly discovered, the court denies Palivos's motion on that ground.

Palivos also appears to ask the court to vacate his conviction and grant him a new trial on the basis of Black's June 2005 deposition testimony which, he contends, proves that Bouzanis was free to obtain the funds for his down payment from the sellers or any other available source. In short, Black's June 2005 deposition testimony, which was given after Palivos's criminal trial, is not newly discovered evidence; it is newly created. Black's deposition testimony on this issue principally relates to his interpretation of the commitment letter, as well as his communications with Marcy Mermel of the Money Store. These issues were addressed at trial. And Palivos was undoubtedly aware that Black had information relating to them and had the opportunity to cross-examine both Black and Mermel at trial.

## ORDER

Defendant's Motion for Leave to File an Oversized Brief Instanter [#272] and Motion for Leave to File Memorandum of Law [#273] are granted. Defendant's Motion for an Order for a Rule to Show Cause Why AUSA William Hogan, Former AUSA Eric Wilson, AUSA Marsha McClellan, Attorney Elliot M. Samuels, and Federal Agent Thomas Heinzer Should Not Be Held in Contempt for Perpetrating a Fraud Upon the Court in this Case, and in Covering Up that Fraud [#260], is denied.

Dated: September 21, 2005        Enter: _____
                                 JOAN HUMPHREY LEFKOW
                                 United States District Judge